UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
COLIN EDWARDS,

                Petitioner,

-against-

                                      **MEMORANDUM & ORDER**

DALE ARTUS, Superintendent,                      06 CV 5995

                Respondent.
---------------------------------------------------------------X
DEARIE, Chief Judge.

      Habeas petitioner Colin Edwards was convicted in January 2004, after a jury trial, of intentional second-degree murder for the fatal stabbing of his wife. He received the statutory maximum sentence of 25 years to life. The Appellate Division unanimously affirmed his conviction. People v. Edwards, 29 A.D.3d 710 (2d Dep't 2006). Leave to appeal was denied. People v. Edwards, 7 N.Y.3d 788 (2006).

      Here, in his petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254, Edwards raises three claims: (1) the jury's rejection of his defense of extreme emotional disturbance ("EED") was against the weight of the evidence, (2) his sentence was excessive, and (3) his trial counsel was ineffective for not making Confrontation Clause objections to the testimony of a medical examiner about the autopsy that her colleague performed, and to the admission of the autopsy report itself.

      For the reasons set forth below, the application is denied and the petition is dismissed.

## DISCUSSION

### I. The Jury's Rejection of the EED Defense

#### A. EED under New York Law

Section 125.25(1) of the New York Penal Law provides that a person is guilty of second-degree murder when "[w]ith intent to cause the death of another person, he causes the death of such person." N.Y. Penal Law §125.25(1). The statutory definition further provides:

> except that in any prosecution under this subdivision, it is an affirmative defense that:
>
> (a) The defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

Id.

The affirmative defense of extreme emotional disturbance (EED), if established, is only partial, for its effect is not to acquit a defendant but instead to reduce the crime of conviction to first-degree manslaughter. See Penal Law § 125.25 (1)(a) ("[n]othing contained in this paragraph shall constitute a defense to a prosecution for . . . manslaughter in the first degree"); § 125.20(2) (a person is guilty of manslaughter in the first degree when "[w]ith intent to cause the death of another person, he causes the death of such person . . . under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25"). N.Y. Penal Law § 125.20(2).

This defense generally arises in cases involving "mental trauma" or "mental infirmit[y]" that does not rise to the level of insanity. People v. Casassa, 49 N.Y.2d 668, 677, cert. denied,

449 U.S. 842 (1980). See also DeLuca v. Lord, 77 F.3d 578, 584-85 (2d Cir.) (collecting New York authorities), cert. denied, 519 U.S. 824 (1996). Although the state typically bears the burden of *dis*proving a defense, see Penal Law § 25.00(1), EED is an "affirmative defense" that a defendant has the burden of proving by a preponderance of the evidence. N.Y. Penal Law §25.00[2]. The United State Supreme Court has rejected a constitutional challenge to precisely this burden-assignment scheme. Patterson v. New York, 432 U.S. 197 (1977) (statute assigning to the accused the burden of proving EED did not violate due process protections)

**B.    EED "Weight" and "Sufficiency" Claims on Habeas**

In urging that his conviction be reduced from murder to manslaughter, petitioner takes no exception to the elements of second degree murder, the requirements of EED, the trial court's instructions on these matters, or his opportunity to present his defense. Instead, he challenges only the jury's rejection of the defense as being "against the weight" of the evidence. "Weight" claims, in contrast to those addressing the "sufficiency" of the evidence, are generally not cognizable as federal claims for habeas purposes. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996); Morrison v. Ercole, 06-CV-1144 (RJD), 2008 WL 4722095, *1 (Oct. 21, 2008). Nevertheless the *pro se* papers can fairly and appropriately be read as claiming that there was insufficient evidence to support petitioner's murder conviction. See, e.g., Salinas v. Artus, 07-CV-3420 (LBS), 2007 WL 4292033 (S.D.N.Y. Dec. 3, 2007) (treating as "sufficiency" claim a habeas petitioner's "unmistakably factual" claim that jury's rejection of EED was "against the weight of the evidence"). The Court also draws counsel from other decisions in this Circuit that, taken together, are understood as affording plenary treatment to habeas claims involving the EED defense in New York murder trials. See, e.g., DeLuca v. Lord, 77 F.3d at 585 (affirming grant

of habeas relief; performing full factual review to conclude that trial counsel was ineffective for abandoning EED defense when petitioner's version of facts "were more than plausible" and EED "was of great potential importance" to defense strategy); Rice v. Hoke, 846 F.2d 160, 161-64 (2d Cir. 1988) (in affirming denial of habeas claim that request for EED instruction was improperly refused, court considered totality of circumstances claimed to warrant the charge); Maddox v. Lord, 818 F.2d 1058, 1059-1062 (2d Cir. 1987) (reversing denial of habeas petition and ordering evidentiary hearing to explore reasons for counsel's failure to interview medical professional for purposes of developing EED defense).

Because we treat the claim as a "sufficiency" challenge and the Appellate Division rejected it squarely as a challenge to the "weight" of the evidence, Edwards, 29 A.D.3d at 710, our review is necessarily *de novo*. A petitioner making a sufficiency claim on habeas bears a "very heavy burden." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 310 (1979) (emphasis in original). Under this "rigorous standard," a "'federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir.1994) (quoting Jackson, 43 U.S. at 326).

C.  **The Trial Evidence**

It is undisputed that petitioner stabbed his wife a total of 43 times in the early morning hours of July 12, 2002, that his wife had been having an affair, and that the couple had been

-4-

having an extended disagreement about the fact of the affair immediately before the stabbing occurred. It is also undisputed that petitioner made a prompt 911 call after the stabbing, waited for the arrival of EMS and the police, immediately confessed to the stabbing, was remorseful, and cooperated with authorities. At issue are only the following: (1) the competing set of inferences each side derives from petitioner's accounts of the crime, and (2) the conflicting opinions about petitioner's mental state offered by the two forensic psychiatrists who testified.

1. Petitioner's Statements

Petitioner did not testify, but his three materially consistent accounts of the crime were presented to the jury: officers testified to the remarks he volunteered at the scene and to the statement he made after his arrest and Miranda waiver; the jury viewed the videotaped statement petitioner made after a second Miranda waiver; and the jury listened to the recording of petitioner's 911 call.[1]

When officers arrived at the scene, petitioner was sitting in a chair, covered in blood, crying, and told the officers, "She's in there." Petitioner immediately volunteered, "I stabbed her." He asked whether his wife was "going to be OK" and when told that she had died, began to cry, and told police, "I didn't mean to do it. She was cheating on me and I see [sic] her with her boyfriend and he calls here and he hangs up and she said she wasn't going to leave him."

At the precinct, following Miranda warnings, petitioner told officers that his wife of ten years was having an affair with a man who lived down the street and who telephoned often but hung up when petitioner answered. His wife had been living elsewhere for a time but recently

---

[1] Petitioner does not challenge the validity of his Miranda waivers or otherwise dispute the voluntariness of his statements.

moved back temporarily. They argued daily about the affair, with petitioner's wife declaring that, because their young son was now in Trinidad, she could do as she wished.

The stabbing occurred during one such argument: after his wife pushed him, petitioner went into the kitchen, picked up a knife lying on the counter, returned to the bedroom, and began stabbing his wife. After his first thrust of the knife, petitioner's wife asked him what he was doing. Petitioner did not answer his wife but continued to stab her.

The account delivered in petitioner's videotaped statement furnished additional details, including: (i) petitioner had learned about his wife's affair approximately a month earlier; (ii) the fight on the night of the crime began because petitioner noticed the other man's telephone number on the answering machine; (iii) his wife pushed him several times, not just once, before he went into the kitchen for the knife; (iv) after the initial jab and his wife's question ("what are you doing?"), petitioner recalled stabbing her only four or five more times, not 42; (v) petitioner believed that he did not continue to stab his wife after she stopped resisting; and (vi) after the stabbing, petitioner telephoned his friend Nigel and told him what had occurred. Petitioner was asked but was not able to demonstrate for the video-camera how he committed the crime.[2]

2. Other Evidence.

Nigel testified, confirming that petitioner called him in tears and asked him to care for the couple's son because petitioner had just stabbed his wife. Nigel told petitioner to call 911.

---

[2] The Court was not furnished with the videotape; the parties' descriptions of the tape's contents in their briefs to the Appellate Division, however, are detailed and consistent. The Court file also lacks a copy of the 911 tape or a transcription. Defense counsel referred to the 911 call during summation, noting that petitioner was "very clearly" crying on the tape and that the 911 operator instructed petitioner to perform CPR, but that petitioner did not do so because, in counsel's words, petitioner was too "overwrought."

The man involved in the affair also testified, confirming that his sexual relationship with the deceased began several months earlier. The man also admitted that he had sometimes called petitioner's apartment but only recalled hanging up on petitioner once. On the night of the stabbing, he was visiting the deceased's brother in an apartment on the same floor as petitioner's.

A bent knife was recovered from under the deceased's body.

Upon petitioner's arrest, he was first taken to Kings County Hospital to be treated for several cuts to his own hands. He could not recall how he sustained the wounds.

3.   The Psychiatric Testimony

Forensic specialist Dr. Bardey testified for the state. (Petitioner does not here challenge Bardey's qualification as an expert). Bardey opined that although petitioner did not plan the crime, he *did* make a decision to kill his wife in the final moments.[3] The attack was the result of escalating anger, not loss of control, because (1) it occurred after a lengthy argument; (2) the weapon was not in arm's reach; (3) petitioner elected to leave the room, pick up the knife, and return with it, all deliberate actions; (4) despite a brief pause—when, after the initial jab, his wife asked him what he was doing—petitioner resumed the attack. He added that the stress of petitioner's financial difficulties probably added to the anger that culminated in the tragedy that night.

Forensic psychiatrist Dr. Weidenbacher, an expert for the defense, testified that petitioner acted in an "extraordinary state of emotion." He based his conclusion on three interviews with petitioner, a transcript of petitioner's videotaped statement, the report of the state's expert, and

---

[3] Premeditation, or malice aforethought, is *not* an element of second-degree murder under New York law. See Penal Law §125.25.

the notes of the state's investigator.

In Weidenbacher's view, petitioner presented a "classic case of extreme emotional disturbance." Petitioner was "frustrated" and "degraded" by his wife's open defiance of him and her "flaunt[ing]" of her infidelity, which made petitioner the "talk of the neighborhood." Petitioner, who had no history of psychological problems, "lost all perspective" and "lost track of himself." The "ferocious, disinhibited, uncontrolled" nature of the assault, which even caused the knife to become bent, was strongly indicative of an "extraordinary, uncontrolled . . . highly emotional outburst." The attack was also the result a "simmering" that had begun several years earlier, during the deceased's previous extra-marital affair. Petitioner's immediate remorse, lack of flight, phoning of the police, and continued sadness a year later all typify a person who had momentarily lost control.

**D.     Analysis**

In challenging the jury's rejection of his EED defense, petitioner emphasizes two features of the EED standard: first, that test contains a subject component in that the fact-finder is to assess EED from "the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be," N.Y. Penal Law § 125.25(1)(a); and second, that a defendant asserting EED need only satisfy the preponderance standard, not reasonable doubt. Id. Factually, petitioner appears to argue that his own account of the crime speaks for itself, revealing that, in committing the especially ferocious act against his wife, he "snapped," a phenomenon that is the essence of EED. See, e.g., People v. Moye, 66 N.Y.2d 887 (1985); People v. Harris, 95 N.Y.2d 316, 319 (2000). In arguing that he met his burden, petitioner also relies on the opinions offered by the defense expert, and marshals evidence that, in his view,

-8-

establishes that he suffered a "black-out" at the time of the crime. He points in particular to: his inability to demonstrate, when asked, how he committed the crime; the fact that he recalled stabbing his wife only four or five times, not forty-three; and his inability to recall how his hands came to be wounded. Finally, petitioner argues that it was his wife's open flaunting of her affair that distinguishes his case from others in which an affair alone has been found not to be a "reasonable" explanation for EED purposes. See, e.g., People v. Fisher, 177 A.D.2d 704 (2d Dep't 1991).

Respondent agrees that the facts legitimately land this case inside EED territory, and further agrees, "without question," that the trial court's decision to give an EED jury instruction was entirely appropriate. But where the evidence arguably gives rise to a contrary set of inferences, respondent argues, it was solely the province of a properly charged jury—and not this habeas Court—to decide which inferences to accept. This Court agrees.

To be sure, petitioner seeks to cast his application as modest by habeas standards; he is not seeking release or a new trial, but only a reduction in the crime of conviction from murder to manslaughter. Nonetheless, petitioner misapprehends the role of this Court and the important difference between a trial and a habeas petition. Now that a properly charged jury has rejected the inferences that might have supported his defense (and the Appellate Division has found that verdict to be "not against the weight of the evidence," Edwards, 29 A.D.3d at 710), even treating the "weight" claim as one for sufficiency, we still determine only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact," Jackson v. Virginia, 443 U.S. at 310, could have rejected petitioner's defense and thus found the essential elements of second-degree murder beyond a reasonable doubt. Id.

The Court finds, within petitioner's own statements, a sufficient basis upon which a rational juror could have done exactly that: infer deliberate action and the intent required for second-degree murder. As already summarized, petitioner first left the bedroom, proceeded into the kitchen, retrieved a knife, and then returned to his wife before stabbing her; he also paused briefly after the initial stab before resuming his attack. Although petitioner's view of the record may not be wholly unreasonable, the Court must presume that the jurors resolved any choice among competing inferences in favor of the prosecution. Jackson, 443 U.S. at 326. Petitioner's sufficiency claim, therefore, is meritless.

## B. The Sentencing Claim

Petitioner argues that his sentence of 25 years to life was excessive. His principal ground is that the sentencing court ignored the evidence offered in support of the EED defense. He insists that although he did not persuade the jury, his EED-based arguments should nonetheless have had some mitigating influence on the sentencing court.

Plaintiff's position is somewhat understandable: he has no criminal history, received the statutory maximum sentence, see Penal Law § 70.00, and the possible mitigating role of petitioner's emotional state on his culpability might have been a closer call than the sentencing court's remarks suggest. Indeed, the sentencing court appears to have rejected EED not only on evidentiary grounds but conceptually as well.[4] But petitioner has not established a basis for habeas relief.

---

[4] At sentencing, the court remarked that petitioner's crime "was nothing less than a vicious attack, not only on [the deceased] but on [petitioner's] son as well." The court continued: "I would really like to know what anger, jealousy and pride, although extreme sense [sic], became extreme emotions—I just don't understand that, how these feelings could mitigate murder."

Petitioner raised this claim in his state appeal, the Appellate Division rejected it (albeit summarily, as one of petitioner's "remaining claims" found to be without merit), and that decision is treated as an adjudication on the merits for §2254(d) purposes. Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006). Petitioner must show, therefore, that the state court acted contrary to or unreasonably applied Supreme Court law, or made an unreasonable factual finding, and this he cannot do. His claim of excessiveness does not present a constitutional issue because it is within the allowable statutory range, albeit at the statutory cap. Dorsey v. Irvin, 56 F.3d 425, 427 (2d Cir. 1995) (citing, White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992)) ("[n]o federal constitutional issue arises . . . when a state sentence is within the range allowed by state law"); Cherry v. Fillon, 01-CV-8240 (DGT), 2006 WL 657062, *8 (E.D.N.Y. Mar. 13, 2006) (rejecting excessive-sentence claim for same reasons).

Petitioner also challenges his sentence on a separate ground. He claims that the sentencing court inappropriately penalized him for making turning down a plea offer of fifteen years and exercising his right to go to trial. He points in particular to the following remarks of the sentencing court:

> I offered a sentence of 15 to life but, instead, [petitioner] chose to go to trial, and during that trial, he exposed [the deceased] to humiliation in death as well as taking her life by having photographs introduced in evidence of an unclothed murder victim and then asking me for the same plea. Well, it doesn't work that way.

We read petitioner's pro se papers as invoking what the Supreme Court has recognized as a due process protection against the rare occurrence known as "vindictive sentencing." See, e.g., North Carolina v. Pearce, 395 U.S. 711 (1969); Wasman v. United States, 468 U.S. 559, 564 (Due Process Clause protects against increased sentences "actually motivated by vindictive

-11-

retaliation by the judge"). This ground, too, was raised on appeal and summarily rejected, so petitioner must show that the state court unreasonably applied or acted contrary to Supreme Court law. Jimenez, 458 F.3d at 146; 28 U.S.C. § 2254(d).

This particular due process protection evolved principally to "guard against vindictiveness in the re-sentencing process," Chaffin v. Stynchcombe, 412 U.S. 17, 25 (1973); when vindictiveness is claimed to result from the decision to go to trial, it is typically the prosecutor, rather than the sentencing judge, whose actions or words are challenged. See, e.g., Bordenkircher v. Hayes, 434 U.S. 357 (1978). Although courts decline to "rule out . . . the possibility" that a defendant could establish a due process violation by "proof of actual vindictiveness," Wasman, 476 U.S. at 568, no decision of the Supreme Court or any federal court has yet recognized an actual due process violation based on a claim of *judicial* vindictiveness attributable to a defendant's *decision to go to trial*. Indeed, in the absence of proof of actual vindictiveness, the Supreme Court has upheld as perfectly constitutional the disparity between a sentence negotiated as part of a plea and one imposed after trial. Corbitt v. New Jersey, 439 U.S. 212, 218-19 (1978). The latter is not a penalty but simply the result of a defendant's choice. As Judge Bianco of this Court has expressed it: "[a]lthough a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not always forbid requiring him to choose." Wheeler v. Phillips, 2006 WL 2357973, *10 (E.D.N.Y. 2006).

In short, defendants routinely make and bear the consequences of the same wager that petitioner made. The manner in which the sentencing court spelled out the eventual result of petitioner's decision to go to trial was perhaps not the most well-considered, but we do not find

in the remarks themselves or within their larger context any "proof of actual vindictiveness." Wasman, 476 U.S. at 568. Accordingly, the state court's sentencing decision was neither contrary to nor an unreasonable application of Supreme Court law.

## C. Ineffective Assistance of Trial Counsel

Petitioner claims that his trial counsel was ineffective for failing to make a Confrontation Clause objection to the admission of the autopsy report on which the cause of death was not redacted, and to the testimony of state medical examiner Dr. Frederic, who had reviewed the report but did not herself perform the autopsy. The court admitted the report as a business record under section 4518 (a) of the New York Civil Practice Law and Rules, without objection from the defense, and allowed Dr. Frederic, who had reviewed the report, to testify to its contents. Based on report, Frederic testified about the number, type and depth of the various stab wounds, and stated that four in particular were fatal.

Petitioner raised this claim in a supplemental pro se brief he filed with the Appellate Division, and the court summarily, but expressly, rejected the claim. People v. Edwards, 29 A.D.3d at 710 ("[petitioner's] remaining contentions, including those raised in the supplemental pro se brief, are without merit"). The only question here, then, is whether the Appellate Division's rejection of this claim was contrary to or an unreasonable application of Supreme Court law. See 28 U.S.C. § 2254(d). The answer is unquestionably no.

To succeed on an ineffectiveness claim, petitioner would have to establish both that, "in light of all the circumstances, the identified acts or omissions [of defense counsel] were outside the wide range of professionally competent assistance," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." Strickland v. Washington, 466 U.S. 668, 690 (1984).

Petitioner cannot satisfy the first prong of Strickland: counsel was not deficient in failing to object to the admission of the un-redacted autopsy report or Dr. Frederic's testimony. Autopsy reports have long been routinely admitted as business records under N.Y. C.P.L.R. 4518(a) or Fed. R. Evid.803(6) and, as the Supreme Court has recognized, business records are within the group of hearsay exceptions covering "statements that by their nature [are] not testimonial." Crawford v. Washington, 541 U.S. 36, 56 (2004). To be sure, the reformulation of Confrontation Clause jurisprudence in Crawford and Davis v. Washington, 547 U.S. 813 (2006) (which emphasized the importance of context for analysis of confrontation clause questions) have occasioned thoughtful discussions by both the Second Circuit and the New York Court of Appeals on the admissibility of autopsy and other medical reports of non-testifying medical experts. See United States v. Feliz, 467 F.3d 227, 232-37 (2d Cir. 2006) (re-examining the admissibility of autopsy reports "through this new lens [of] *Crawford*"), cert. denied, 549 U.S. 1238 (2007); People v. Rawlins, 10 N.Y.3d 136 (2008) (considering federal, New York and other states' decisions on admissibility of autopsy reports in addressing as "issue of first impression" whether DNA and latent fingerprint comparison reports prepared by non-testifying experts are "testimonial" within meaning of *Crawford*), pet'n for cert. filed, 07-10845 (May 9, 2008). Nonetheless, the Second Circuit has re-affirmed that, even under Crawford, autopsy reports remain admissible as non-testimonial business records. Feliz, 467 F.3d at 232-237.

The autopsy report having been properly admitted at petitioner's trial, the non-examining medical examiner was free to testify about its contents, so a hearsay or Confrontation Clause objection would have been fruitless. See, e.g., People v. Miller, 91 N.Y.2d 372, 380 (1998)

(state's forensic pathologist could "render[] her opinion based on facts in the record . . . despite the fact that she had not personally examined the corpus delicti or performed the autopsy"). The Appellate Division's rejection of petitioner's claim that counsel was ineffective for failing to make a meritless hearsay or Confrontation Clause objection was, therefore, not contrary to or an unreasonable application of Strickland or Crawford.

Furthermore, even if could be said that counsel should have made such an objection, petitioner could not possibly satisfy the second prong of Strickland because he cannot show that he was prejudiced as a result of counsel's decision. See Strickland, 466 U.S. at 690. Petitioner does not dispute that he was the agent of the stab wounds inflicted on his wife or suggest that she could have died from some cause other than those wounds. Therefore, any conceivable error in admitting the autopsy report or Dr. Frederic's testimony concerning cause of death would have been utterly harmless in the context of this case.

## CONCLUSION

For the foregoing reasons, the application is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
March 19, 2009

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge